Good morning, everyone. I'm Judge Park. I'm here with Judges Nardini and Garnett Manasci. We have three cases on the calendar today, one of which is on submission. And I understand that all counsel are present here in the courtroom. So we can dispense with calling the calendar and get started. We'll hear argument first in D.Y.J. Holdings v. Intercontinental Exchange at all, No. 20-1492. Thank you. Okay, Mr. Marth. Thank you, Your Honor. I may have pleased the Court, Ryan Marth, on behalf of Appellant and Intervention, D.Y.J. Holdings, LLC. In Sentara, Your Honors, this Court reversed a dismissal by the same District Court Judge for requiring that plaintiffs definitively prove the allegations of their complaint and for failing to extend inferences in those plaintiffs' favor. Respectfully, the District Court Judge made the same error here. By starting with a 230-page complaint filled with two-and-a-half years of individual submissions by 16 panel banks, analysis of why those submissions were below any measure of what the banks' actual borrowing costs were, and factual allegations to put this all into context. The District Court took that detailed complaint, threw it out in a 14-page opinion that required 18 times that the plaintiffs come forward with evidence, often direct evidence. I don't think we could have a more fundamental misapplication of Rule 12 than what the District Court did. Well, before we explore that issue, can we talk about the jurisdictional question as to whether you have standing here? So you're not bound by the judgment below, right, because you are not party to it. So why do you get to prosecute this appeal? Sure. So what the motions panel decided on that point was that, or what it allowed, was for DYJ to intervene and substitute in for the prior representatives. It made the right decision. Well, the order didn't say substitute for the prior representatives. It just said intervene. So your status is as an intervener, right? Right, and we made our intent clear that we wanted to intervene as a representative. But what the motions panel decided is entirely commonplace, and I direct the Court to its recent opinion in fund liquidation holdings where it discussed, cited with approval, a Seventh Circuit opinion, the Carpenter's Trust case, where it says that intervention or substitution, addition of a representative, could be appropriate for any reason at all. And that's really what happened here. DYJ, when this complaint was filed and it's assigned, had every reason to rely on the fact that the prior representatives were pursuing its interests and litigating actively on its behalf. When it stepped out, when there was an indication they might step out. But they weren't actually litigating on DYJ's behalf, right? They were litigating on their own behalf. There was no class that had yet been certified. And I don't think that matters, Your Honor. The district court's decision is to dismiss the claims on the merits, right? So doesn't this look a lot like there's litigation between two other parties and a third party comes in and wants to pursue an appeal for the party that lost? It doesn't, Your Honor, precisely because this is a class action. And there are rights of the absent class members even before a class is certified. As just one example, I direct the court to the American pipe tolling doctrine, right, where, for example, an absent member of the class can come around years after a putative class action complaint is filed and claim the benefit of the statute of limitations tolling from the date of the first complaint. That wouldn't make sense if it was just two individuals in litigation, right? The reason that the Supreme Court fashioned that rule, and it's really the same principle that applies here, is that the courts try to protect the interests of the absent class members. And that's what I think the motions panel decided and correctly decided. Now— But, of course, that decision, the tolling rule only applies to individual claims, not to a subsequent class action. So it does seem like they're just balancing the rights of individual class members against the right to pursue a class action. I'm sorry. We're all wearing masks here today. The tolling rule only applies to individual claims, not to a subsequent class action, right? So there's a balancing there about individual claims and not that the class action needs to be pursued at all costs. That's a very good point, Your Honor. Then I will direct you to how this court ended the fund liquidations holding opinion, when it distinguished between joining—filing a subsequent class action and joining into an ongoing class action, which is what the substituting or, I guess, intervening parties in fund liquidation holdings did, and what DYJ is doing here. And then, again, of course, this court then cites Seventh Circuit saying that addition or substitution of class representatives, again, proper for any reason. That's precisely to protect the class and also to foster the resolution on the merits of some of these issues. And what are these issues? Can I ask a related question about standing? Yeah. What exactly was DYJ's injury here? There's no allegation about what transactions were involved, which defendants they were transacting with, dollar amount, states, you know, the typical type of information that you would have to establish standing. All we have is an affidavit where the principal, Mr. Prezzisano, says that he believes he was underpaid, and we don't know on what or by how much or by whom. Right. And just that on its face wouldn't be enough for standing. On the second part of that statement, Judge Parker, I respectfully disagree. In an antitrust class action, you often have a plaintiff coming to court saying, I directly purchased widgets from one or more of the defendants. And that's sufficient to confer standing. He doesn't even say that, though, does he? Well, he does say he was directly underpaid. I mean, this is all assuming, of course, that the affidavit counts as part of the complaint, too. Of course. So Mr. Prezzisano did come in and say that he was underpaid, received underpaid interest directly from certain of the banks. Which banks? It doesn't say, does it? We indicated in our motion to intervene, perhaps it should have been in the affidavit, but we indicated in the motion to intervene a number of banks. So this is stuff that, I mean, I think, if I understand the rules, for standing, a plaintiff needs to have standing at all times and a plaintiff needs to establish that. And, you know, assuming that the posture that you were discussing with Judge Menasche is kosher, DYJ would still need to have the injury that the initial plaintiff started out with. And it has alleged that. It submitted a declaration under penalty of perjury that it was underpaid on interest by one or more of the panel bank defendants. True, it's not specified in the affidavit. That is specified in our motion to intervene. Again, as this court said in Sentara, any monetary injury is sufficient to confer standing. This court was right then. Yeah, I remember Sentara. There were, I mean, there were transactions there. You had the stuff that I just mentioned, dates and transactions, and that's why this stood out to me was that it's markedly different in terms of what's lacking. Right. So, yeah, so, again, the declaration from DYJ was intended, and I think does set forth what is typically there to establish standing in an antitrust case, but not to move to the merits of what. Just for one second. So if you had intervened in the district court, would you have had to file your own complaint? That is what we would have done in the district court. That's correct. So if your allegations are not in the operative complaint here, isn't that a problem? No. So you're saying on appeal we should substitute a declaration for your own complaint? Right. At least under the peculiar circumstances of this case, or the particular circumstances of this case, because, you know, a complaint is not a proper pleading on appeal. We could file a complaint in the district court. District court doesn't have jurisdiction. So what we did is a DYJ came into court with a declaration saying that it adopts the allegations of the complaint, at least as to the substance of the violations, and added factual allegations. I think I got that. You can talk about the merits. Pleadings. It was harm. Sure. So on the merits, again, the district court erred by not extending inferences in our favor. But I want to take a moment and explain what the case looks like if, in fact, the district court did what it was supposed to do. You'd have two and a half years worth of submissions by the individual panel banks moved together in a tight band. And you'd have an explanation that this wasn't just a response to common stimuli, because there were no common stimuli. There was no interbank lending market that could have acted as common stimulus. To the extent the individual banks are responsible. Well, you are saying that all of the treasury departments at all of the banks are net payers of LIBOR, right? Yes. You are saying that actually all of the people who are making the submissions have an incentive to underestimate it, right, and that exists independent of any kind of collusion between the banks. Well, right. And we don't just stop there, however. We also explain how absent an agreement, it would not be in a single bank's interest to lowball its submission because it might get caught by ICE's monitoring mechanism. But it wouldn't be economically irrational. You're just saying they shouldn't do it because they might get caught. But it makes no sense. Usually in these cases where we talk about whether it makes sense for an individual bank to do it, we say that it's irrational or it goes against their interest to do it. But that's not the case here. Right. So an individual might, as we say, might have a motive to lowball the submission. However, if that was the only individual doing it, A, that individual would find out that it's not effective at pushing ICE LIBOR interest rates down, and B, second, he or she might get caught. And also, let's put this in a greater context. Doesn't that cut the other way then, logically? It's kind of like a prisoner's dilemma problem. You have to make sure everyone's on board, otherwise there's some risk that you're going to get the short end of it. That's exactly it, right? So, yes, I'd love interest rates to go down, but I don't want to get caught doing it, so I've got to bring in the others to make sure that it actually happens. Yeah, but isn't the opposite inference that they've always been doing it and each of them would be independently afraid to stop doing it, right? I mean, that's the question, is if you're saying that they each independently have an economic reason to be doing it and you're saying that sort of no one would want to break from this PAC behavior for fear of sticking out like a sore thumb, but don't they each have individually a reason to not want to stick out like a sore thumb? Well, so let's bring this back to what the banks were supposed to be doing here, and that is they're supposed to be making submissions per the definition of ICE LIBOR that reflect their borrowing costs. They weren't doing that for all the economic indicators that we said, and by the fact that each one of these was doing this for at least two and a half years, we have publicly available information, at the very least, raises a plausible inference that something amiss was going on. But, again, that just raises the possibility of parallel behavior, right? I mean, it may be all of them, because you've already explained they all have an economic motive to do it, right? So just to back up, is there any allegation about what the situation was before this window of time when you claim that the antitrust behavior began? So, for example, was there a date when nobody was doing this and then all of a sudden they started lowballing the market together? You know, do you see a jump when there would be no explanation for why they would have been presumably acting pursuant to their economic interests, and then all of a sudden as a pack they dropped down and started doing it and there would be no rational explanation for why they all suddenly changed their behavior, if not through some coordinated activity? So I am into my reply time. Yeah, please. So in this case, it's a bit odd in that the index, the benchmark, was being fixed before as well. So there isn't really a clean period. I think I'd direct the court to the four economic indicators that we put in our complaint to show that this wasn't truly reflecting the bank's borrowing costs, that this was not honest, these were not honest submissions. It's not just pure chance that this was happening. Also, we filed our complaint in 2019. We could not then allege a clean period because there wasn't a clean period. I do understand that the market has changed since then and that now after reforms were implemented to ICE LIBOR, I do believe that there is now a period where the ICE LIBOR submissions did increase. I guess my point is if you go back to Twombly, one of the things that the Supreme Court said is, and this is my paraphrasing, these local telephone companies already had bad habits. They had bad habits of being local monopolists. And then regulation changed and they could break out, and you know what, they stuck with their old habits. But that doesn't suggest that they were colluding in a decision to maintain their old habits. Right, so Twombly was a nine-page complaint. This is 230 pages, and we put that in context. We explained that the banks had the opportunity to conspire. So they're frequently meeting. That may not be your strongest point, that they were getting together with the Fed and maybe then that's when they were talking about conspiring. They were probably talking about conspiring when the Fed wasn't there. They could have colluded. Okay, but I mean at that point you could also suggest you could have alleged that they all have e-mail or they all have cell phones, right, as well as saying that they were all getting together during meetings with the Fed. And when the Fed people walked out of the room, they were secretly conspiring. I have a more specific question about the communications. I mean your allegation is that the economic incentive applies to the treasury departments at the banks, right? Correct. But then the opportunities for communication are the banks at large, right? Are these conferences of the treasury departments? I believe there were people involved in the ICE LIBOR submission process, Your Honor. So at the conferences it's limited to that section of the banks. And not just talking about trade conferences. I mean we're talking about meetings where these banks are getting together discussing ICE LIBOR. Granted, at the actual meeting if the Fed is there, that's true. But it's not about proving that they actually did conspire. I mean the district court judge wanted us to plead what was said. We can't do that. Well, the plus factors are supposed to give you an opportunity to provide some circumstantial evidence of a secret agreement. I think that's kind of what's behind that. And what you're alleging here is a couple dozen defendants had a secret agreement to do this, and you're pointing to just generalized communications where there were meetings and profit motives and external statistical analyses. And I just don't know how that is indicative or suggestive of a secret agreement. Right. I'm way over my time. Yeah, we'll give you – you can save a reserved three minutes and we'll give you that. Sure. Thank you, Your Honor. I think the answer to that lies in putting all of these allegations together into one puzzle. The fact – we talked about this parallelism. The fact that they're below these economic indicators shows that they weren't being honest about their borrowing costs. And keep in mind the definition of ICE LIBOR was for these banks to be reporting in what their actual cost of borrowing was, or their interbank borrowing costs were. But the key is a secret agreement. I mean I know there's a lot of things that could be going on financially, but the secret agreement, that's what the plus factors are supposed to get at. Can you speak to how the combined total of them points to a secret agreement? Right. Because you know you have parallelism. You know you're – in a normal antitrust case, you're price-fixing widgets. You might have data in there that says, well, hey, widgets are below what a competitive market would – or I'm sorry, above what a competitive market would say they'd be at. But that's that point. And then we say, well, hey, we've got reason to say that it's at least plausible that something's going on because these banks are constantly getting together to talk. It's – they have – the individuals who make the submissions have an incentive to lowball it, but not just one. But it doesn't work if just one does it. It only works if they all get together. By the way, these – many of these same banks already pled guilty to doing the same thing with BBA LIBOR. So you put that all together. Could it be subject to an innocent explanation? Maybe. Maybe. But if the rule 12 – Can I ask one other point, just a clarification? There seems to be some dispute in the briefs about which banks had access to the IOER rate. Is there an allegation in the complaint that all of the panel banks and entities from which they might borrow had access to that rate? The best answer to that question is to direct the court back to the ICE LIBOR definition, which is that it is the – paraphrasing here – the rate at which banks could borrow in the interbank lending market from similar banks. So the banks that would have access to – I know, but isn't there a dispute as to whether the banks from which the panel banks might borrow actually could lend at the IOER rate to the Federal Reserve Bank? I thought their – my understanding of their dispute was a little different. It was just – it was that they could lend from other banks that don't have access to IOER. I thought that was their contention. And that, I'm trying to explain, it doesn't make sense because the definition of ICE LIBOR or the definition of LIBOR is at the rate at which they can borrow from similar banks, all or at least almost all of whom do have access to IOER. Okay. Thank you, Mr. Roth. You reserve three minutes for rebuttal. We'll hear next from the FLE's Mr. Lesser. Thank you, Judge Park. May it please the Court, David Lesser from King & Spaulding for the bank defendants. Your Honor, the district court correctly dismissed this highly implausible complaint. But as your opening questions suggested, DYJ hasn't made any of the allegations in that complaint, and I'd like to just start by discussing the problems with the intervention. Allowing an absent class member to intervene to pursue an appeal of a dismissed and abandoned complaint would be entirely unprecedented. We're not aware of any court of appeals that has allowed an absent class member to pursue an appeal under these circumstances. Well, we have the McDonald case, right? And so you would allow an absent class member to intervene and then appeal the denial of class certification. And why is that very different? So in this litigation, it would have moved on to class certification if it had not been abandoned. And so why doesn't an absent class member have the same interest in the case that that member would have in McDonald? Well, Your Honor, in McDonald, and that is the one narrow exception that the Supreme Court and some courts of appeals have applied, in McDonald, not only wasn't the complaint abandoned, the plaintiffs in that case prevailed. They went all the way to judgment, and they had sought an interlocutory 23-F appeal of the denial of class certification. And then at the end of the case when they won, they decided not to appeal the denial of class certification at that time. And so the Supreme Court said, well, an absent class member can come in for this narrow purpose to litigate whether the class should have been certified. And in the other case— prevailing or not prevailing on a motion to dismiss? That the class member only has—the absent class member only has a sufficient interest in appealing the case once there's some determination that the claims are meritorious? I think the more important distinction is that the absent class member has an interest to intervene to litigate the issue of class certification. But why is that, right? So an absent class member wouldn't be bound by the denial of class certification, right? The absent class member could bring another class action complaint afterwards. It's not preclusive of anything. So why doesn't that look a lot like this case, where they have an interest in this litigation even though it's being litigated by other parties? Well, Your Honor, I don't think the absent class member in that circumstance, at least not following China Agrotech, which obviously comes much later than McDonald— You're saying there would be a time limit problem, but they wouldn't be bound. They might miss the statute of limitations or whatever, but they wouldn't be bound by the judgment denying class certification because they weren't a party. That's correct. Right. So they don't have that level of an interest in the judgment, and yet the Supreme Court said that an absent class member has enough of an interest in that judgment to appeal. And so why is that different from here, where the absent class members were relying on this litigation to vindicate their rights? Well, because, Your Honor, under China Agrotech, the plaintiffs here are not entitled to rely for the purpose for which they're trying to intervene. In other words, China Agrotech says specifically that plaintiffs who want to intervene and serve as class representatives can't wait in the wings and wait to see what happens with the litigation and then later intervene. If you want to serve as a class representative or if you have any concerns about the fate of the complaint or the adequacy of counsel or what have you, you have to intervene, file your own complaint at the very outset of the case. That allows the district courts to sort out who's going to serve as a class representative, and then the case proceeds in an efficient manner. Alternatively, you can wait and see, but then you're left with the benefit of American pipe tolling and you can file your own individual case. I don't have a better answer for the exception that the Supreme Court carved out in McDonald except to say that that's the only circumstance I'm aware of where that sort of intervention has been permitted, and it's very different from here. Whether or not DYJ should have been permitted to intervene, Your Honor, what we know today is that the motions panel permitted the intervention. It was before the original plaintiffs had withdrawn from the case. Now DYJ is the only plaintiff in the case that has not filed a complaint, and as Judge Park pointed out, the only assertion it's made is in an affidavit saying it believes it was underpaid on some unspecified ICE-LIBOR-linked instruments. If you pretend that those assertions were in a complaint, clearly it wouldn't state a claim. Under Twombly, clearly it wouldn't. Well, they adopted the complaint, right? Your Honor, I don't think they actually do claim to adopt the complaint. If you look at the affidavit, it doesn't say I adopt the allegations in the complaint. Even if they tried, this Court has said very clearly that an affidavit is not a substitute for a pleading. You can't actually adopt. So how would you actually propose they do that, file a complaint with us? I mean, we have the mandate, right? You can't be filing stuff in the district court right now. Would you have proposed that they file it on ECF in the Second Circuit? Should we have the motions panel have remanded it for the limited purposes of allowing them to file the complaint? I mean, mechanically. Let's say it's okay to do that. How would one mechanically do that? Well, I'm not sure that you can under these circumstances, but Well, let's say it's the facts of McDonald. Let's say there's denial of class certification and they want to intervene after judgment, but the mandate has already traveled to the court of appeals. Are you saying that then you wouldn't be able to intervene, even though the Supreme Court has said that you could intervene in those circumstances? So what would you do in those circumstances? Well, there are rules in the district court to seek relief from the judgment and a conditional order from the court. You could seek a conditional remand to the district court. They could have attached a complaint to a pleading, you know, the way you would under Rule 24, which is the governing rule here and does require attaching a complaint when you seek to intervene. I'm hesitant to give procedural advice to opposing counsel. Well, that's the thing. I mean, the thing is that there is no rule on appeal that says you can intervene on appeal, but the Supreme Court said you can. I mean, you can, or we have allowed that. So the question is sort of the mechanics of that and the limits of that. Your Honor, respectfully, I don't think that even in the McDonald situation, it had to do with intervening on appeal in a case that had been dismissed in the district court. In other words, it was an intervention to file an appeal of the denial of class certification at the end of the case. So there was an existing case, existing plaintiffs. It was a very different situation from here where you have plaintiffs coming in and trying to appeal a case. Why does the procedural posture matter? I'm just trying to understand the reason for your distinction of McDonald. Well, if nothing else, it's an Article III issue, Your Honor, because you have no existing plaintiffs who are asserting any claims. But that's true in McDonald too, right? The intervener would not have filed the complaint in that case. No, I don't think it's true, Your Honor, because the plaintiffs had prevailed. In other words, there was a case. The district court hadn't dismissed the case. But there hadn't been class certification, and the intervener was not a party to the original case, so the complaint was not filed by that party, and there was no class certification that made the intervener a party to that case before intervention. Fair enough. Courts have made exceptions to the requirement under Rule 24 to file an intervener complaint in instances where the intervention was not strictly to serve as a party, as a substitute party. In other words, you might intervene, and there's a circuit split on this issue, but you might intervene, and I'm mindful of my time. I do want to talk about the actual complaint. Parties in some courts have been permitted to intervene without filing an intervener complaint to, for example, participate in discovery, serve subpoenas, and in this narrow exception, contest denial of class certification. But to serve as a party is, to my knowledge, completely unprecedented. If I could talk about the original complaint in my remaining time, Your Honor. The complaint alleged a highly implausible conspiracy that over 50 defendants attending meetings joined by regulators with public agendas and minutes conspired to manipulate the ICE LIBOR benchmark from its very inception in 2014 through today and perhaps beyond. The complaint has no direct evidence whatsoever of this, no chats, e-mails, or anything else of the sort that courts have pointed to in sustaining complaints. It also doesn't plead any adequate circumstantial evidence, no parallel conduct, and no plus factors. This is the rare case where the complaint doesn't even succeed in alleging parallel conduct. If you look at the court. Roberts. Can you speak to the complaint that does allege that ICE LIBOR shouldn't have gone below certain benchmarks without, unless there was manipulation? And why isn't that enough to survive dismissal? Well, Your Honor, the most that that could plead would be suppression, in other words, injury. That wouldn't even establish parallel conduct. And it's black-letter law under Twombly that you need more than pleading suppression or even parallelism. You need to plead plus factors absent direct evidence. Well, why isn't it parallel conduct if they're all moving below the benchmark in unison? Well, they're not. I know it's not strictly in unison, but they're all doing it below the benchmark. Well, because, Your Honor, if you look at the chart the plaintiffs themselves submitted, it shows that the submissions aren't in parallel. They're crisscrossing jumble mess. And they are below IOER for part, but not all of the class period. But they haven't come close to establishing that IOER is a valid comparator. And why isn't it a valid comparator? So if other banks could lend to the Federal Reserve at the IOER rate, isn't it implausible that the other banks could get a loan and could borrow money below that rate? No, Your Honor. For the reasons you were alluding to before, the LIBOR question is at what rate could you borrow at 11 a.m. in London. Many of the banks that lend in the interbank market aren't eligible for IOER. So they would lend at rates that are lower than IOER. The Fed article that the plaintiffs cite in their complaint explains how this works. The IOER doesn't even establish a floor for the Fed funds rate because, as that article explains, a number of the institutions that participate in the Fed deposit program aren't eligible for IOER. So they lend at lower rates. So you can borrow at rates below IOER. This is the issue that the court— Why aren't these questions a fact? That's the end of the question. For the reasons the court recently explained in the Mandela case, the question is whether the plaintiffs have plausibly alleged that IOER or the other comparators they cite in the complaint are probative and valid comparators, and they haven't done that. Admittedly, when you're dealing with financial instruments and benchmarks and monetary policy, it requires a bit more from a district court to get below the superficial assertions. But when you scratch the surface here, the allegations fall apart entirely. These are simply not valid comparators for reasons that plaintiffs' own documents explain. Even if you accept the allegations about parallel conduct, even if you accept that LIBOR should have been set above IOER, plaintiffs haven't come close to establishing any of the plus factors, which here operate more like minus factors. There are no interfirm communications. They do plead the opportunity to engage in communications, but in highly implausible circumstances, in meetings attended by regulators. There are no government investigations. The purported prior misconduct cuts against an inference of a conspiracy here, the idea that on the heels of the BBA LIBOR settlements and investigations and heightened regulatory scrutiny, the banks would immediately engage in similar conduct with respect to ICE LIBOR is highly implausible. There's no common motive to conspire here. The explanation counsel gave is that the Treasury funding desks somehow were universally net payers. That's pure speculative group pleading in the complaint. There's nothing specific about any of the banks. But moreover, the allegation is that the funding desks were net payers internally at the banks, to other desks at the bank, not with respect to external counterparties. And there are no acts against self-interest to the extent that that concept even makes sense. Is that a problem in itself? I mean, can you have allegations that some internal part of the bank had a certain incentive or a motive that the overall bank did not share? Would that be itself a problem, or do the allegations have to run to the bank as an institution because it's the actor? If there is a part of the bank that is responsible for the submissions, why can't you say that they have a motive? It goes to the plausibility inference that the claims are asking the court to draw. So if one desk at the bank has an incentive, but it's implementing it to the detriment of another part of the bank and the overall position of the bank is not net short liable, it becomes far more implausible that just operationally something like that would give rise to a conspiracy undetected and implemented at meetings attended by regulators and other people at the bank. Leaving aside that they haven't successfully alleged that the funding desk actually were net payers. What's the status of the regulatory investigation to the extent that you can generalize? Your Honor, I'm not aware of any regulatory investigation. If you're referring to the letter that the plaintiffs cite. Yeah, I thought they referenced. And when I say plaintiffs, of course, I'm referring to the plaintiffs who abandoned the case. Understood. It's a letter from an attorney asking to be walled off from the matter coming out of a government job. It doesn't disclose an investigation as far as I'm aware, but I don't know anything more about it. That's certainly not enough and not anything like the type of investigations that this court has found sufficient for this plus factor in Gell-Bohm or Starr v. Sony BNG or many other cases. The last plus factor is acts against self-interest. There are none here, as your questions alluded to. The concept of an act against self-interest in a price-fixing case refers to the fact that a competitor can't raise its prices indiscriminately without losing market share, and so it would be against interest to do that. Or if you observe, say, 80% of the market suddenly raising their prices and charging prices well above their marginal cost, you might infer an agreement from that, because absent an agreement, one of those competitors would drop their prices and gain market share. Those are the facts in Starr. That dynamic doesn't apply here whatsoever. The plaintiff's own allegation is that the funding desks had a unilateral incentive to manipulate the rate lower, and so if they found themselves in a situation where other banks were setting rates low, the incentive would not be then to raise their rate to gain market share. There's no logic to that allegation, and that's why that plus factor was not identified in Gelboim or in any of the other benchmark cases I'm aware of. It's just complete nonsense. I'm way over my time. With respect to personal jurisdiction, I'll rest on the papers, except to say that personal jurisdiction is plaintiff-specific and claim-specific, and so along with all the other issues raised by DYJ's intervention here, it couldn't possibly plead personal jurisdiction over the foreign defendants in the case. If there are no questions, I'll stop there. Thank you, counsel. Thank you. Mr. Hackey? Good morning, Your Honors. May it please the Court, Adam Hackey of Sherman & Sterling for the ICE defendants. ICE benchmark administration, which I'll call IBA, is the administrator of LIBOR. All of the arguments that you heard from Mr. Lesser and in the panel bank's briefing as to why this case should be dismissed in full apply equally to the ICE defendants, which are also affiliates of IBA. However, the ICE defendants are subject to dismissal for additional and secondary reasons. District Court did not reach those reasons because it didn't need to, nor does this Court in the event that it chooses to affirm for the reasons Mr. Lesser has argued. So my argument is that even if a conspiracy were sustained and this complaint were sustained in some part, there's no basis for the ICE defendants to be in this case. And it starts from a basic principle of antitrust law and conspiracy law, and you could trace it to many cases, but one is Monsanto against Sprayright in the Supreme Court's decision there. There, the Court noted the need for a, quote, conscious commitment to a common scheme designed to achieve an unlawful objective. There needs to be a conscious commitment, and the ICE defendants simply do not fit that. It's not properly alleged that they do under Twombly. Well, don't some of the ICE entities share a unity of interest, corporate interest? That's an allegation, Your Honor. I think that those are—the point I'm making now is focused on why even IBA, which is the administrator, is not liable. But with regard to the other ICE defendants, the types of unity of interest allegations that are made are kind of the same kind of make-weight arguments you can make about any corporate affiliation. I'm happy to go through that in detail as needed. But with regard to IBA, it neither submits rates nor is it alleged to benefit from the objective of this alleged conspiracy, which would be to lower LIBOR and lower the rates that panel banks have to pay. Plaintiffs basically admit that they're starting a deep plausibility hole. The ICE defendants are not panel banks. They're not competitors of the panel banks. They don't make LIBOR submissions. Their conduct is not part of the statistical analysis that's at the heart of the case. They're not alleged to have engaged in any parallel conduct. Most of the plus factors cited have no application at all to the ICE defendants, nor did the ICE defendants have a motive to suppress LIBOR. They had nothing to gain from it being high, low, or staying the same. Plaintiffs made no serious effort in their opening brief to even defend their claims against the ICE defendants. Well, the plaintiffs suggested there was an incentive because they wanted to remain as the administrators of the LIBOR, right? So if all the panel banks are engaging in this conduct, the incentive is for the ICE defendants to go along to maintain their position. Why isn't that sufficient? Well, Your Honor, first, that's a plus factor. That motive allegation is a plus factor that assumes you have parallel conduct. The ICE defendants are not alleged to have engaged in parallel conduct. That's the first thing I would say. Secondly, motive alone, even if it were an applicable factor, is not enough to establish an actual conscious commitment and acts in furtherance of conspiracy. And I do want to come back to that. But as to the motive allegation, I mean, if you take that to its logical end, that could be said as to any administrator of any benchmark, right? If a conspiracy is revealed on the administrator's watch, maybe the benchmark will disappear. That's the allegation. That could not have happened as to LIBOR for a variety of reasons, but that's an allegation. Again, maybe the administrator suffers some reputational injury, but that could be said literally of every benchmark, and that cannot be enough to put you into a conspiracy to fix prices as a non-competitor. And, in fact, there are obviously powerful disincentives to participate in a conspiracy if you're in a benchmark administration business where you're specifically mandated to play that role, where there's heavy regulatory supervision. Here the FCA, you know, London, the U.K. regulator is heavily involved. You know, having been found to collude would be the worst thing that could happen to an administrator. So I would argue that under Twombly the inferences are overwhelmingly actually against what the plaintiffs are saying. But just going to whether or not the ICE defendants did anything from which this court could infer that they participated in a conspiracy, even leaving aside motive, I mean, what do the plaintiffs say? It's all at pages 20 to 24 of their reply brief. They didn't address it in the opening brief. They say that the ICE defendants concealed the panel bank's misconduct. How? The linchpin of this case is the four comparisons that the plaintiffs are making to other rates. We don't agree that those are apt comparisons, but they don't deny that every one of those things was public. In other words, that the FCA, which regulates LIBOR, could have looked at that and drawn the same conclusion that the plaintiffs did if it were a valid one. But the Fed could have done the same thing. The IAR is its own rate. And so the notion that IBA participated in concealing something, it just doesn't support it. The idea that, oh, well, there was... But isn't there still an allegation that they didn't intervene to police the panel bank's ignoring of the benchmarks? They do make that allegation, Your Honor. And with regard to... First of all, there's case law that we cited in our brief, including the Standard Oil decision from the Seventh Circuit and Judge Engelmeyer's decision in the Southern District with regard to the interest rate swap antitrust case. Failing to identify and prevent collusion on someone else's part is not conscious commitment to a conspiracy and not enough for a Section 1 claim. Now, they say IBA was aware of collusion and failed to act, which is somehow different, and that that could put you into a conspiracy. But what are the allegations that it was aware of collusion and failed to act? It's the very same public comparisons of public information that were available to lots of other watchdogs, and no one reached that conclusion. And if anything, the allegations really get twisted because if you look at what they argue in their opening brief, they say, well, the panel banks needed to conspire and in unison move their submissions down because otherwise outlier lower submissions would have been captured by IBA's audit process. I think that's at page 24 of the opening brief. So they can't at the same time argue that this was a conspiracy designed to evade detection of IBA's efforts and then say IBA was in on the collusion. It's one or the other. And the rest of what the plaintiffs point to, Your Honor, with regard to IBA's conduct is all of the routine types of things you'd expect an administrator to do. Participating in an oversight panel, speaking to the panel banks at whose rates they administer. You know, all functions one would completely expect an administrator to do, which they've sort of weaponized into something nefarious, but it would be much more concerning had IBA not been doing those things. And it doesn't seem to me that any of them could support an inference of a conspiracy. At the end of the day, I think the most you can fairly read out of this complaint is that plaintiffs believe that IBA should have detected a conspiracy and should have stopped it. That, I submit, is clearly not enough to plead a Section 1 claim against IBA. And I think that's the fairest reading of this complaint. The only other point I would make, unless the panel has questions, if I may, is there's a reference to Gelboim in plaintiffs' reply brief and the fact that it supposedly concluded that BBA, which was the predecessor administrator to IBA, was appropriately in an antitrust case. I just want to make sure the panel is aware, because it's a complicated procedural history that occurred with respect to Gelboim. BBA, which was the predecessor administrator, was not even in the case that went up on appeal in Gelboim. At the time, the district court made that decision that there was no antitrust standing. BBA later was added to the case while the case was on appeal to this court and participated in the Gelboim appeal by virtue of a joining letter. There was no briefing by the plaintiff or defendants in Gelboim about whether the administrator could be liable or under what circumstance. Rather, this court reversed the core standing threshold decision that Judge Buchwald made in that case and sent the case back, and BBA went back with it. BBA later, from various of these libel cases, was dismissed on jurisdictional grounds. But there is no holding of this court or the district court that, in a differentiated sense, an administrator would be liable under these circumstances. And I do believe in that respect this court would be the first, if it were to reach that conclusion, and I would respectfully submit that on this record there is no basis to do that.  Thank you, Your Honor. Mr. Marth, you have three minutes for rebuttal. Thank you, Your Honor. I want to start by just addressing a couple of points with respect to the intervention issue. Your Honor has, I think, rightly pointed out some of the difficulties with whether or not DYJ should have filed a complaint here on appeal. I'd like to suggest to the court that if this court thinks that that really is a deficiency with DYJ, we'd suggest that the proper remedy would be to allow DYJ to amend its affidavit to include a draft complaint as would be submitted with the district court. Explain why I don't think that's necessarily the right procedure, but in that we're looking at Federal Rule 24, that's what a district court would do under similar circumstances. With respect to counsel— But then you'd be submitting a different complaint, right? I mean, so we're on appeal of the complaint that the district court— of the dismissal of the complaint the district court considered. So that would mean it would go back to the district court and you would have a new proceeding. And that's the reason why I don't think that's the best procedure to follow. I'm just saying as opposed to an outright dismissal— Oh, I see. But you agree that if you had to do that, in fact, we would have to dismiss this appeal because this is an appeal from a complaint that you did not file in an order to which you were not a party. That is correct, and that's some of the difficulty. I understand it's an alternative argument. I just wanted to clarify. Okay. To counsel's point about the IOER point, not all banks having access to it, what the defendants are referring to is that some banks could borrow from GSEs, government-sponsored entities, Fannie Mae, Freddie Mac, et cetera, at rates below IOER. But the problem is the definition of ICE LIBOR is at what rate could you borrow from similar institutions? And, of course, in order to borrow from a similar institution, you need a similar institution to lend to you. And what rational institution would lend to you at a lower rate than what it could just deposit its funds at the Fed with? As Judge Park, I think you raised the issue of government investigations. I don't know the status either. I would direct the Court to JA564 for the statement by a defense counsel who was acting head of DOJ Antitrust that he could not participate because of prior government work. Well, that would be reading quite a bit into a disqualification letter. I mean, that would create quite a disincentive for lawyers to disqualify themselves. That's an abundance of caution, right? If you're going to say, well, every time you disqualify yourself saying I have an ethical complaint, we're going to interpret what they were doing for their prior client? It seems a little dangerous. I want to direct the Court to where in the record that was because there seemed to be some confusion. Can I just ask, just so I'm clear on what your view is, tell me what you think the lay of the land would be if you win and then what the lay of the land would be if you lose. So if you win, if you prevail here and we were to send it back, in your view then DYJ becomes the plaintiff. You will have adopted the complaint below. Who knows, maybe you clean it up by filing an amended complaint that's verbatim but just has you in there. Is that sort of your view of the world if you win? That's correct, Your Honor. And if you were to lose and we were to, let's say, leave you in as a party, I guess, let's say you intervene properly but we were to reject the claims and the merits, what's the lay of the land there? Are you then bound by that judgment and then your client has lost on that? That would be correct. And that would have preclusive effect as to you. If some other plaintiff came along and there were no statute issues, they could litigate away. Just as if the original one of the three original representatives had lost. Okay. All right. I see I'm over my time. Can we wrap up briefly? Yeah, sure. Your Honor, I could say a lot about the complaint in this case. Threadbare is not one of the words that should be used to describe it. The district court erred by not viewing that, not viewing it in the light most favorable to the plaintiffs. We therefore request that this court reverse and remand. Thank you, counsel. We'll take the case under advisement.